AO 91 (Rev. 11/11) Criminal Complaint

FILED
UNITED STATES DISTRICT COURT
LAS CRUCES, NEW MEXICO
MAY 15 2026
MITCHELL R. ELFERS
CLERK OF COURT

# UNITED STATES DISTRICT COURT

for the

District of New Mexico

United States of America
v.
Juan Gabriel Torres, Sergio Seanez, and Titus Josiah McGaw Bulger

Defendant(s)

Case No. 26-2295 MJ

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of May 11, 2026 in the county of Doña Ana in the District of New Mexico, the defendant(s) violated:

| Code Section | Offense Description |
| --- | --- |
| 18 U.S.C. §§ 111(a)(1), (b) and § 2 | Assault Involving a Dangerous Weapon and the Infliction of Bodily Injury Upon a Person Assisting Officers of the United States |

This criminal complaint is based on these facts:

See attached Affidavit in Support of Criminal Complaint.

☑ Continued on the attached sheet.

Complainant's signature

FBI Special Agent Lilly Aldana

Printed name and title

Sworn to before me ~~and signed in my presence~~ VIA PHONE.

Date: 5/15/26

Judge's signature

City and state: Las Cruces, New Mexico

Gregory J. Fouratt, U.S. Magistrate Judge

Printed name and title

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

I, Lilly Aldana, a Special Agent with the Federal Bureau of Investigation, being duly sworn, depose and state that there is probable cause to find that Juan Gabriel Torres (TORRES), Sergio Seanez (SAENEZ), and Titus Josiah McGaw Bulger (BULGER) violated 18 U.S.C. §§ 111(a)(1), (b) and 18 U.S.C. § 2 (Assault Involving a Dangerous Weapon and the Infliction of Bodily Injury Upon a Person Assisting Officers of the United States) as follows:

> On or about May 11, 2026, in Doña Ana County, in the District of New Mexico, TORRES, SEANEZ, and BULGER forcibly assaulted, resisted, opposed, impeded, intimidated, and interfered with John Doe, a Doña Ana County Detention Center (DACDC) correctional officer who was assisting officers and employees of the United States Marshals Service (USMS) in the performance of their official duties, and such acts by TORRES, SEANEZ, and BULGER involved the use of a dangerous weapon, and the infliction of bodily injury, upon John Doe.
>
> In violation of 18 U.S.C. §§ 111(a)(1), (b) and 18 U.S.C. § 2.

### Relevant Statutes

1. Under 18 U.S.C. § 111(a), it is a crime to "forcibly assault[ ], resist[ ], oppose[ ], impede[ ], intimidate[ ], or interfere[ ] with any person designated in [8 U.S.C. § 1114, which includes "any person assisting" any "officer or employee of the United States" in the performance of that officer or employee's "official duties," § 1114(a)] while [the person designated in § 1114 was] engaged in . . . official duties."

2. Whoever violates 18 U.S.C. § 111(a) by "us[ing] a deadly or dangerous weapon . . . or [by] inflict[ing] bodily injury," may be punished by up to 20 years in prison. § 111(b).

3. Under 18 U.S.C. § 2, "[w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission" or "[w]hoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States" is "punishable as a principal."

**Jurisdiction**

4. In discussing the scope of 18 U.S.C. § 111, the Tenth Circuit has observed that "federal criminal liability protects *any* person assisting [a federal] officer or employee." *United States v. Holder*, 256 F.3d 959, 965 (10th Cir. 2001) (emphasis added) (quotation marks omitted) (observing that a "a fact specific analysis" is used to determine whether one is providing such assistance). "[I]n determining whether an individual is a person 'assisting' a federal officer, the issue can be framed as 'whether the performance of his [or her] official duties was for the purpose of assisting a federal officer.'" *United States v. Nelson*, 579 F. Supp. 3d 1251, 1255 (D.N.M. 2022) (Riggs, J.) (quoting *United States v. Ama*, 97 F. Appx. 900, 901–02 (10th Cir. 2004)).

5. For example, the Tenth Circuit has held that "a private citizen . . . helping a federal employee plot a fence funded and approved by a federal agency[ ] was assisting a federal employee" for purposes of § 111 when he was assaulted. *Ama*, 97 F. Appx. at 902 (citing *Holder*, 256 F.3d at 965); *see also Holder*, 256 F.3d at 965–66 (observing that "the reach of 'assisting'" under § 111 even "protect[s] a handyman employed by a private company [that the USMS had hired] to install wallboard in a single-room occupancy hotel . . . [that was] seized by the federal government" when that handyman was assaulted (citing *United States v. Matthews*, 106 F.3d 1092, 1093–97 (2d Cir. 1997))); *United States v. Bedford*, 914 F.3d 422, 430 (6th Cir. 2019 ("hold[ing] that when an employee of a private company carries U.S. mail on behalf of the USPS, pursuant to formal contract, he assists an officer or employee of the United States in the performance of official duties" for purposes of § 111).[1]

---

[1] *See, e.g.*, *Ama*, 97 F. Appx. at 902 (rejecting defendant's arguments that because a state correctional officer was "guarding both state and federal inmates in the same area, without the presence or supervision of a federal employee," it was "impossible to separate where the guard's state employment ended and his supposed federal function commenced" and instead holding that the officer was "assisting" the USMS—and not because of the federal status of the *inmate* who assaulted him, but rather because of what the *officer* was doing: "acting pursuant to a contract to provide assistance to the United States Marshal, whose official

## Probable Cause

### A. John Doe Was Assisting the USMS as Part of His Official Duties

6. On May 11, 2026, at approximately 10:00 p.m., John Doe was performing his official duties as a DACDC correctional officer when he entered the "C1 pod" at DACDC to conduct an inspection of all thirteen male inmates in this particular housing unit. Three of the inmates in this housing unit were federal inmates, and the remaining ten inmates were state inmates. This housing unit has two floors, and two federal inmates were assigned to cells on the bottom floor, and one federal inmate was assigned to a cell on the top floor.

7. As part of John Doe's duties as a DACDC correctional officer, he is responsible for guarding federal inmates—including by ensuring that these inmates (like the state inmates) are properly housed and monitored and by addressing any concerns regarding their health, welfare, and safety. John Doe's responsibilities towards these federal inmates is based on an Intergovernmental Agreement between the United States Attorney General (on behalf of the USMS) and DACDC. This agreement authorizes and subcontracts the housing of USMS prisoners to DACDC while they are awaiting adjudication of their federal criminal charges. Pursuant to this agreement, all correctional officers at DACDC are deemed to be "assisting" officers and employees of the USMS in the performance of their official duties for purposes §§ 111 and 1114 when those correctional officers assist with USMS prisoners—since the "official duties [of the USMS] include housing prisoners awaiting federal trial". *Ama*, 97 F. Appx. at 902.

8. John do was responsible for all thirteen inmates in the C1 pod—including the three

---

duties include housing prisoners awaiting federal trial" and was "[t]hus . . . performing the same duties and functions that a federal officer would perform"); *United States v. Grant*, 979 F.3d 1141, 1144 (6th Cir. 2020) (holding that "a private prison guard supervising the housing of federal inmates" at a state detention center was "assisting" the USMS because "[i]f not the [private prison guard], a federal employee would have been carrying out those same duties"—and further observing that "[e]very one of our sister circuits to consider the issue [including the Tenth Circuit]" has "reach[ed] this conclusion").

federal inmates. Specifically, he was responsible for (1) ensuring that the six inmates with cells on the top level (including one federal inmate) were locked in their proper individual cells in the C1 pod; (2) ensuring that the seven inmates with cells on the bottom level (including two federal inmates) were either in their cells or in the common area of C1 pod;[2] (3) and assessing whether there were any concerns that needed to be addressed with respect to their health, welfare, or safety of any of these thirteen inmates.

9. In carrying out these responsibilities, John Doe was required to scan each inmate's ID card, which they may carry with them or have displayed in the windows of their respective cells. In addition to scanning their cards and ensuring the inmates are where they are supposed to be, John Doe is also required to physically observe the condition and behavior of each of these inmates to assess whether any issues need to be addressed concerning their health, welfare, and safety. (After performing these actions, John Doe is then further required log his actions on electronic tracking devices at the end of both the top level and the bottom level.)

**B. Defendants Assaulted John Doe While He Was Assisting the USMS**

10. When John Doe entered the C1 pod housing unit shortly after 10:00 p.m. on May 11, 2026, he began walking up the stairs to the top level to begin his official duties with observing and monitoring the six inmates—including one federal inmate—who were supposed to be locked in their cells on the top level and then making a formal record of his headcount and welfare check of these inmates.

11. But as John Doe came to the top of the stairs, he was met by TORRES, SEANEZ, and BULGER, who were all standing at the top of the staircase—and who were not allowed to be

---

[2] The seven inmates with cells on the bottom floor, which included state inmates TORRES, SEANEZ, and BULGER, had previously been let out for recreation in the "dayroom" of the housing unit. (The six inmates assigned to cells on the top floor were all supposed to be locked in their cells, since the top and bottom floors of this housing unit have separate recreation times.)

at the top of the staircase, or anywhere else on the second floor, during their recreation time. The instant Jon Doe reaches the top of the stairs, TORRES lunges at John Doe and tries to punch him. John Doe then ducks down to defend himself and grabs TORRES near the waist and begins to push him backwards.

12. Two other inmates who are standing nearby—SEANEZ and BULGER—immediately begin attacking John Doe too, by grabbing and punching him. These three inmates quickly bring John Doe to the ground—with SEANEZ on the ground holding onto John Doe and hitting him, TORRES punching John Doe on the body and face, and BULGER kicking and stomping on John Doe's head and neck area. BULGER forcefully kicks John Doe in the head area approximately fifteen times—while holding onto a side rail for additional leverage and force as he is kicking and stomping on John Doe's head. As BULGER is beating John Doe's head, he becomes unconscious—but BULGER's stomping and kicking on John Doe's head still continue, as do the punches by SEANEZ and TORRES. In the 22 or seconds it took these three inmates to attack John Doe, they punched him approximately 30 times and kicked him approximately 15 times—including while he was unconscious. Near the end of this violent assault—while John Doe's unconscious and motionless body is lying on the floor—TORRES unholsters John Doe's taser and then tases his unconscious body. Additional guards begin to enter C1 pod to respond to this assault, and the three inmates stop the assault.

13. Below are selected screenshots of the assault:









14. John Doe was immediately given medical care and transported to a hospital. Although John Doe regained consciousness and survived the attack, had the other DACDC guards not responded as quickly as they did, the very serious injuries suffered by John Doe could have been immensely worse—if not fatal.

15. When TORRES, SEANEZ, and BULGER assaulted John Doe, he was "assisting" the USMS as part of his "official duties." §§ 111(a)(1); 1114(a); *Ama*, 97 F. Appx. at 901–02. Specifically, he was walking up the stairs—not to interact with these three inmates, who were not supposed to be there—but to observe and monitor, among other inmates, a federal inmate on that upper floor and thereby assist the USMS "whose official duties include housing prisoners awaiting federal trial." *Id.*

<u>**Conclusion**</u>

16. Probable cause exists to believe that TORRES, SEANEZ, and BULGER violated

18 U.S.C. §§ 111(a)(1), (b) and 18 U.S.C. § 2 (Assault Involving a Dangerous Weapon and the Infliction of Bodily Injury Upon a Person Assisting Officers of the United States) when they intentionally and forcibly assaulted, used a dangerous weapon on, and inflicted bodily injury on a correctional officer on May 11, 2026 while that officer was assisting members of the USMS in the performance of their official duties.

17. Assistant United States Attorney Grant Gardner reviewed the charges filed in this criminal complaint.

Respectfully submitted,

Lilly Aldana
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me VIA PHONE. on May 15, 2026.

Honorable Gregory J. Fouratt
UNITED STATES MAGISTRATE JUDGE